J-S23042-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| THEODORE W. NUNEZ | : | |
| | : | |
| Appellant | : | No. 1929 EDA 2023 |

Appeal from the Judgment of Sentence Entered February 16, 2023
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0001654-2021

BEFORE:   STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED JANUARY 10, 2025**

Theodore W. Nunez appeals from the judgment of sentence imposed following a jury trial in which Nunez was found guilty of two counts of aggravated indecent assault (lack of consent), two counts of aggravated indecent assault (child less than 13 years of age), three counts of indecent assault (lack of consent), three counts of indecent assault (child less than 13 years of age), one count of indecent exposure (child less than 16 years of age by person four or more years older), one count of corruption of a minor, one count of indecent exposure, one count of corruption of a minor (course of conduct), one count of unlawful contact with a minor, and one count of

_____

[*] Retired Senior Judge assigned to the Superior Court.

endangering the welfare of a child (course of conduct).[1] For these offenses,

Nunez received an aggregate term of twenty-four years and nine months to

fifty-six years' imprisonment.[2] On appeal, Nunez raises five issues that, *inter*

_____

[1] **See** 18 Pa.C.S. § 3125(a)(1); 18 Pa.C.S. § 3125(a)(7); 18 Pa.C.S. § 3126(a)(1); 18 Pa.C.S. § 3126(a)(7); 18 Pa.C.S. § 3127(a); 18 Pa.C.S. § 6301(a)(1); 18 Pa.C.S. § 3127(a); 18 Pa.C.S. § 6301(a)(1)(i); 18 Pa.C.S. § 6318(a)(1); 18 Pa.C.S. § 4304(a)(1).

[2] In the lower court's own words:

> The court structured the sentence as follows: On count 3, aggravated indecent assault – child less than 13, the court imposed a sentence of imprisonment for not less than five (5) years nor more than ten (10) years. This is a mandatory sentence. On count 4, aggravated indecent assault – child less than 13, imprisonment for not less than five (5) years nor more than ten (10) years to run consecutive to the sentence imposed at count 3. This is a mandatory sentence. On count 1, aggravated indecent assault – lack of consent, imprisonment for not less than five (5) years nor more than ten (10) years to run consecutive to the sentence imposed on count 4. This is a maximum sentence. On count 10, indecent assault of a child less than 13, imprisonment for not less than two and one half (2½) years nor more than five (5) years to run consecutive to count 1. This is a maximum sentence. On count 16, indecent exposure, child less than 16, imprisonment for not less than two (2) months nor more than five (5) years to run consecutive to count 10. This sentence is in the standard range of the guidelines. On count 18, indecent exposure, imprisonment for not less than one (1) month nor more than two (2) years to run consecutive to count 16. This sentence is in the standard range of the guidelines. On count 19, corruption of minor, course of conduct, imprisonment for not less than three and one half (3½) years, nor more than seven (7) years to run consecutive to count 18. This is a maximum sentence. On count 20, unlawful contact with a minor, imprisonment for not less than three (3) years nor more than ten (10) years to run concurrent to count 19. This is in the standard range of the guidelines. On count 25, corruption of minor, imprisonment for not less than two (2)

*(Footnote Continued Next Page)*

*alia*, challenge the Commonwealth's lack of specificity in defining its charges, the weight and sufficiency of the evidence underpinning his convictions, the discretionary aspects of his sentence, and the constitutionality of the Sexual Offender Registration Notification Act (SORNA).[3] We affirm in part, vacate in part, and remand with instructions.

As thoroughly summarized by the lower court:

> P.W.[, the victim,] testified at trial that she first met [Nunez] when she was six (6) or seven (7) years old when her mother[, S.W.,] was dating him. At that time, P.W. and her family (mom and older sibling) was living [on] Lori Lane in King of Prussia, Montgomery County. [Nunez] moved in to the home at Lori Lane when P.W. was around age seven (7). P.W. testified that at first, the relationship with [Nunez] "was good. It was just like hide and seek, that kind of stuff." But then, "things took a pretty big turn in my mind when he … violated my trust" at around the age of seven (7).[]

---

> years nor more than five (5) years to run concurrent to count 19. This sentence is above the aggravated range, but below the statutory maximum. On count 26, endangering the welfare of a child, imprisonment for not less than three and one half (3½) years nor more than seven (7) years to run consecutive to the count 19. This is a maximum sentence. The court imposed no further penalty on counts 2, 7, 8, 9, 11 and 12.

Trial Court Opinion, 9/13/23, at 17-18. In addition, the "court also sentenced [Nunez] to pay the costs of prosecution for counts 1, 3, 4, 10 and 18, finding that each of those counts constitute separate criminal conduct." ***Id***. at 19. "The court also sentenced [Nunez] to pay a fine of $15,000.00 ($5,000.00 each for 3 counts of aggravated indecent assault – counts 1, 3 and 4)." ***Id***. The court also noted that while it did not adjudicate Nunez to be a sexually violent predator, he "is subject to lifetime sex offender registration pursuant to 42 Pa.C.S.[] § 9799.15." ***Id***.

[3] ***See*** 42 Pa.C.S. §§ 9799.10-9799.75.

- 3 -

P.W. testified that the first incident of abuse occurred [when] she was in her room, in her bed, at the home in King of Prussia waiting for "my mom to tuck me in" when she saw [Nunez's] silhouette in the door frame. P.W. testified this occurred when she was approximately seven (7) years old in the third or fourth grade. P.W. testified that [Nunez] walked into the room next to her bed where she was laying while using his hand to touch his private parts. P.W. reported hearing a "clicking sound, like moisture." P.W. went on to testify that [Nunez] "starts pulling on my clothes and puts his hand underneath my clothes and starts touching me" and then "puts his fingers inside." P.W. testified this was "really painful" and "really rough, like, sand paper kind of." P.W. testified that she was lying face up, and the covers and blankets were by her feet because [Nunez] pulled them down. P.W. testified that at first [Nunez] touched her stomach and legs, and then her private areas with his hand, his fingers "rubbing, poking ... [l]ike trying to get inside" her vagina. P.W. testified that during the encounter [Nunez's] other hand was on himself, touching his private part. P.W. testified that when it ended, [Nunez] walked out of the room. [P.W.] felt "very wet, like, very sweaty and uncomfortable and hurting."

P.W. testified about a second encounter with [Nunez] that same night, where he "came in again the same night and pretty much did it again, like, what I already described." [Nunez] came into P.W.'s bedroom a second time; P.W. was still awake. This time, P.W. thought that if she positioned herself on her stomach, face down into the pillow, [Nunez] would be unable to touch her. However, [Nunez] proceeded to pull down her shorts again and "put his fingers inside [my private parts], poked, moved." P.W. reported it felt "more painful that time." The encounter ended when [Nunez] pulled up victim's shorts and walked out.

P.W. testified that the next morning she was exhausted because she could not sleep that night, and she decided to take a shower "because I felt just so weird." This was unusual for P.W. because at her young age her mother would typically remind her to take showers. P.W. explained that she felt "tired out. Like, I had just been stiff, tensed up, you know, not really sure what happened or how to explain it. Also, tired, because I didn't really sleep that well."

P.W. testified about a third encounter with [Nunez]. This time, P.W.'s younger sibling (a baby) was in her bed with her. The

baby was to the left of P.W., in between her and the wall. P.W. testified that [Nunez] came inside the bedroom, climbed into bed, whereupon victim said, "[sibling] is trying to sleep ... we're going to sleep, we're sleeping." P.W. testified that this time, [Nunez] was "touching my side, my hips, my stomach. And then he pulled down my - like, I don't remember if I was wearing shorts or not, but I definitely had underwear on. So he definitely pulled down that. And he did the same thing." "He put his fingers all around my private areas and put them inside and did that." P.W. testified that this was once again "painful." P.W. testified that this time she felt "confused, upset, angry" because her baby sibling was in bed with her trying to sleep. P.W. testified that this incident also occurred when she was around age seven (7).

P.W. testified about a fourth encounter with [Nunez], where [Nunez] once again came into her bedroom and "tried to lay down." This time, her sibling was not there. P.W. testified about "switching between laying on my stomach, laying on my back, laying on my side, trying to figure out how I should lay so that he wouldn't be able to touch me, but he just, like, put his hands under my clothes and did it." P.W. testified that while rolling around in an attempt to get away from [Nunez], [Nunez] "was putting his hands under my clothes and touching me, poking ... inside my private areas." This time, P.W. told [Nunez] she was going to the bathroom, and instead went looking for S.W. in her bed, but S.W. was not in the home.

[Nunez] did not stop there. P.W. testified that she went to S.W.'s bed in an effort to be in a different place from where [Nunez] was located, and that it did not occur to her, a young child at the time, that her mother's bed was also [Nunez's] bed. After a few minutes, as P.W. was laying in her mother's bed, [Nunez] came into the bedroom and assaulted P.W. for a fifth time. [Nunez] came onto the bed and "he tried to do that same thing, you know, pull down my underwear, and, like, he was rubbing all on my side and my stomach and stuff. But this time … I remember saying, no, stop.… And at that point I just scootched off the bed, and I ran all the way downstairs to the couch, and I was just laying on the couch." P.W. testified that "he didn't, like, go inside that time when I was on my mom's bed.… [his hands touched] my side, my hips, my stomach, legs." P.W. testified about laying on the couch and seeing [Nunez] at the top of the stairs, feeling in distress and wondering "why is he following me

everywhere[?]" P.W. testified that she woke up in her own bed the next morning.

In terms of the time frame when these five incidents occurred, P.W. testified that they occurred while she was in third and fourth grade when she was between the ages of seven (7) and nine (9) years old. She does not remember the abuse occurring in middle school (fifth grade through eighth grade). P.W. testified that at the time the abuse occurred, she told a friend who was in her grade. P.W. also testified that she told a babysitter, C.R[.] P.W. testified that she felt comfortable disclosing to her babysitter because "it didn't matter … I didn't have any connection to that person."

P.W. went on [to] testify that in sixth grade, the family (P.W., younger sibling, S.W. and [Nunez]) moved to Hoboken, New Jersey. There were no reported incidents between P.W. and [Nunez] during the time they lived in New Jersey. In approximately 2015, the family moved back to Pennsylvania, this time to Chester County.

P.W. described an incident that occurred in the home in Chester County during the time she was in high school. P.W. described that when she went downstairs to get dinner one night, [Nunez] came behind her and held her waist. P.W. took her dinner upstairs to her bedroom, and [Nunez] later came upstairs to her room with his "pants unzipped and his private part was just hanging out of there." He retrieved [P.W.'s] dinner plate and left.

In August of 2020, P.W. left home to attend college. At that time, the nation was in the height of the COVID-19 pandemic. Each student had to take a COVID test at the nearby hospital, [whereafter the] test was then sent to the school. P.W. testified that she went to the hospital to obtain the COVID test, and there was a mishap in that the test was never sent to the school and the school therefore never obtained the result of the COVID test. School officials required P.W. to obtain a second COVID test in order to remain at school. As a result, P.W. took a second COVID test. When P.W. told S.W. about taking a second COVID test, P.W. reported that S.W. became very upset that the school required a second test when P.W. was not at fault for the mishap with the first test. P.W. reported that S.W. said, "you can't let people do that. You can't let people put things in your body without you …

consenting to it," comparing the nasal swab of the COVID test to rape.

This conversation with S.W. triggered P.W. to send her mother an e-mail on August 22, 2020 disclosing that [Nunez] had "done that to me." P.W. disclosed in the e-mail to S.W. that "[Nunez] raped me twice in the third grade. There was other sexual stuff before that and certainly after that, even up to the senior year." P.W. went on to say to S.W., "I've tried to tell you multiple times over the many years, but I never knew quite – never knew how to quite just say it." P.W. testified she disclosed the abuse to S.W. at this time in her life, when she had recently moved out of the house to attend college, because she had some space and felt like S.W. "probably would have listened."

Shortly thereafter, S.W., with [P.W.'s] permission, reported the abuse to the police. S.W. testified that she called the special victim's unit for the Chester County or Tredyffrin Police, and after making that report she was connected with Detective Connie Marinello of the Upper Merion police department. On or about September 28, 2020, P.W. went for a forensic interview at Mission Kids.

C.R. also testified at trial. C.R. was a babysitter for P.W. and the family … around the year 2012. She was their babysitter for just a few months. C.R. testified that during the time she worked for the family P.W. disclosed to her that [Nunez] would "sit at the edge of the bed and start to massage her and touch her." C.R. testified that she asked P.W. some questions in order to obtain information about what occurred. C.R. testified that she asked P.W. to point on a doll where she was massaged and touched, and she pointed to the doll's "buttocks, the vagina, and the chest."

C.R. testified that she remembered P.W.'s disclosure to her was on a Friday. C.R. did not initially tell anyone about the disclosure. C.R. testified that she took the weekend to think about it and "talk to her family about it and just to prepare." C.R. testified that she was afraid to tell S.W. and was "physically sick" and therefore late for work on Monday. C.R. testified that she called S.W. on Monday morning because she was late, and told S.W. over the phone what P.W. had disclosed to her. C.R. testified that S.W. responded, "so you're not coming in today?" C.R. did not see or speak to the family again (until the investigation of this case in 2020). C.R. testified that she called Child Protective

Services and provided some information to them, but "had a lot of anxiety about this, and I ended up hanging up." C.R. did not hear anything from Child Protective Services again. The next contact C.R. had with the family was prior to the trial in this case when she received an email from S.W. apologizing for not believing her. On November 10, 2020, C.R. provided a statement to Detective Marinello.

S.W. testified at trial. First, S.W. explained how she found out about the reported abuse[] from C.R. S.W. explained that C.R. was frequently late for work, and when she called that morning purportedly to disclose the incident, S.W. fired her for being late before she could say anything about the abuse. It was only after S.W. fired C.R. that C.R. told her what P.W. had disclosed. S.W. testified that she "dismissed what she was saying, and she was just trying to get back at me for having fired her." S.W. testified that she confronted [Nunez] about the abuse, "and his response was like nothing," and "he just walked away." S.W. testified that she confronted P.W. about the incident in this manner [but that P.W. indicated that he had not been touched inappropriately.]

S.W. testified that the next time she heard from P.W. about any incidents of abuse perpetrated upon her by [Nunez] was when P.W. was a teenager in high school. S.W. testified that she was on her way home from work and P.W. told her over the phone that [Nunez] had come into her room asking about dinner, and his pants were unzipped, he was not wearing underwear and "everything was sticking out." S.W. arrived home ten minutes later and found [Nunez] had been drinking and was passed out on the couch. She stated, "[P.W.] seemed fine. So I just figured it was kind of [a] mistake." S.W. testified that in the summer of 2020, [Nunez] initiated divorce proceedings.

&ast;         &ast;         &ast;

Prior to charging the jury, the defense renewed [its] objection regarding the specificity for the aggregated indecent assault charges. The defense conceded that the testimony presented at trial was of "four different times" of aggregated indecent assault. Because the Commonwealth charged two counts of aggravated indecent assault – lack of consent; and two counts of aggravated indecent assault – child under 13 (counts 1-4), each count was listed separately on the verdict sheet. However, the Commonwealth only proceeded at trial with two events of

aggravated indecent assault, explaining that each event encompassed two different subsections of aggravated indecent assault. [At sidebar, the Commonwealth indicated that "]even though there was testimony about more, [it was] only proceeding on two events [and it] would not be seeking to have [Nunez] sentenced separately on four events.[" Based on the court's questioning, the Commonwealth stated that "]the crimes would merge, lack of consent and under 13[."]

Trial Court Opinion, 9/13/23, at 6-15 (record citations and footnotes omitted) (some brackets in original).[4] At the conclusion of the three-day trial, a jury

_____

[4] After this matter's preliminary hearing and Nunez's subsequent waiver of formal arraignment, he filed a request for a bill of particulars. That request was denied without a hearing. As it pertained to the Commonwealth's bill of information, filed after Nunez's particulars request, the court, prior to trial, "asked the Commonwealth to identify which charges they are proceeding with at trial, which charges they are withdrawing, and which charges relate to which incident." Trial Court Opinion, 9/13/23, at 5 (record citation omitted). Of specific importance, at the aggravated indecent assault counts,

the Commonwealth charged two incidents of aggravated indecent assault. However, the Commonwealth charged each incident pursuant to two separate subsections of the crime[.] As a result, the bill of information contained four separate counts of aggravated indecent assault. The Commonwealth explained that the testimony would show three or four separate incidents of aggravated indecent assault, but it was for the jury to decide if they believe that the Commonwealth met its burden for at least two counts. The defense agreed that the testimony could reference three or four separate incidents of aggravated indecent assault. The defense argued that the Commonwealth was required to specifically allege which incident correlates to which counts charged on the bill of information in order for the jury to accurately determine guilt for each charge. … [While the issue was deferred until after the evidence was presented, t]he defense had notice of all charges and the evidence that the Commonwealth was presenting.

*Id*. at 5-6 (record citations omitted).

found Nunez guilty of the abovementioned sixteen offenses. Nunez was then sentenced and resentenced several months later.[5]

After sentencing, Nunez filed a timely post-sentence motion, which was denied. Nunez then filed a timely notice of appeal and, too, complied with the strictures of Pennsylvania Rule of Appellate Procedure 1925.

In his appeal, Nunez presents five issues for our review:

1. Did the lower court err in failing to require the Commonwealth to provide the requisite amount of specificity as to when the complained-of events were alleged to have occurred?

2. Did the lower court err in permitting C.R. to testify as a prompt complaint witness when P.W. disclosed the incident to her in 2012?

3. Did the lower court err in imposing too harsh of a sentence?

4. Did the lower court err in its application of SORNA to Nunez's sentence?

5. Should this case be remanded for resentencing, as the evidence was insufficient at one count and merger should have happened as to another count?

*See* Appellant's Brief, at 10-11.

Nunez's first claim challenges the Commonwealth's refusal to provide a bill of particulars and the court's subsequent denial of his request for the same. Nunez contends that "[s]ince the outset of this case, there has been a

---

[5] Resentencing occurred because, after a court conference three days after the original sentencing hearing, "all parties agreed that the [c]ourt should vacate the sentence and schedule a [r]esentencing [h]earing" due to "deficiencies in the transcript" of the original hearing. N.T., 2/16/23, at 5; *see also* Order, 12/15/22.

significant lack of specificity as to when [the alleged criminal] events occurred[, which] precluded [Nunez] from preparing a proper defense or being able to cross-examine witnesses as to times and places." Appellant's Brief, at 26. Nunez suggests that the Commonwealth's "failure to issue specific [b]ills and the trial court's refusal to mandate more specificity … presented a picture to the jury of a decade of ongoing assaults[.]" *Id*. at 35. In the same section of his brief, Nunez tangentially challenges P.W.'s testimony wherein she apparently provided unclear information as to the dates, relative to her age and school grade, when Nunez had assaulted her. *See id*. at 29-31.

Preliminarily, we note that Nunez has failed to provide any discussion of this Court's standard of review as it pertains to his denied request for a bill of particulars. As highlighted by the Commonwealth, Nunez "cites to three cases, none of which discuss the trial court's decision to grant or deny a request for a bill of particulars. Nor has he included any discussion or comparison of [caselaw] to support his argument." Appellee's Brief, at 24. "Instead, [Nunez] concludes that the timeframe within the bill of information resulted in him being misled at trial, substantially impaired his rights, and prevented him from preparing a defense. He, however, has offered no explanation or analysis to support these conclusions." *Id*. We agree with the Commonwealth insofar as Nunez's brief is deficient in both authority and argumentative development as to this issue. *See* Pa.R.A.P. 2119.

Moreover, Nunez did not follow proper procedure when seeking judicial

review of his request for a bill of particulars. Under our rules of criminal procedure, when the Commonwealth fails or refuses "to furnish a bill of particulars after service of a request, the defendant may make written motion for relief to the court within 7 days after such failure or refusal." Pa.R.Crim.P. 572(C). When that motion for relief is made, "the court may make such order as it deems necessary in the interests of justice." Pa.R.Crim.P. 572(D).

Here, Nunez requested a bill of particulars in May 2021, and the Commonwealth denied his request by letter in September 2021. Nunez did not make a motion to the court within seven days of the Commonwealth's denial. Notwithstanding this inaction, the court, in April 2022, ordered the Commonwealth to formally answer Nunez's request for a bill of particulars. The court then denied Nunez's request that same month.

Although its holding deals with the situation where a bill of particulars had, in fact, been furnished by the Commonwealth and the defendant sought further particulars of the charges, this Court has previously determined that the failure to file a timely motion under Rule 572(C), the same provision that is relevant here, results in waiver of any objection. *See Commonwealth v. Libengood*, 152 A.3d 1057, 1061 (Pa. Super. 2016); Pa.R.Crim.P. 572(C) (providing that "[i]f further particulars are desired after an original bill of particulars has been furnished, a motion therefor may be made to the court within 5 days after the original bill is furnished[]"). Accordingly, given Nunez's failure to adhere to our rules of criminal procedure by filing a motion

requesting a bill of particulars within seven days of the Commonwealth's denial of same, we find that he has waived any challenge to having not received a bill of particulars.

In the alternative, Nunez's substantive claim is meritless. "A bill of particulars is intended to give notice to the accused of the offenses charged in the indictment so that the accused may prepare a defense, avoid a surprise, or intelligently raise pleas of double jeopardy and the statute of limitations." *Commonwealth v. Mercado*, 649 A.2d 946, 959 (Pa. Super. 1994). The notice provided in a bill of particulars is not intended to be a substitute for discovery. *See id*. Determinations made as to bills of particulars are reviewed for an abuse of discretion. *See Libengood*, 152 A.3d at 1059. This Court will not find an abuse of discretion unless: (1) the Commonwealth withheld exculpatory evidence, (2) there are exceptional circumstances, or (3) there are "surprises" at trial. *Mercado*, 649 A.2d at 960-61.

Nunez's request sought, *inter alia*, the "exact date and time of day the alleged acts occurred." Request for Bill of Particulars, 5/25/21. However, Nunez "was provided with a transcript from the preliminary hearing, at which time the victim testified to each offense, and a copy of the forensic interview of the victim, in which the victim describes each offense in detail." Response to Request for a Bill of Particulars, at 4. These documents supplied Nunez with enough information, through P.W.'s testimony, as to the factual underpinnings of each charged crime. Nevertheless, Nunez has not demonstrated any of the

three conditions outlined in *Mercado* and is therefore entitled to no relief having been denied a request for a bill of particulars.

While the Commonwealth must fix a date when an alleged offense occurred with reasonable certainty, giving a defendant sufficient notice to meet the charges and prepare a defense, due process does not always require the "need to prove a specific date of an alleged crime." *Commonwealth v. Brooks*, 7 A.3d 852, 858 (Pa. Super. 2010) (citation omitted). "Any leeway permissible would vary with the nature of the crime and the age and condition of the victim, balanced against the rights of the accused." *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 990 (Pa. Super. 2007) (citation omitted). Additionally, "the Commonwealth must be afforded broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." *Id*. (citation omitted). Furthermore, the Commonwealth is granted a wider than normal latitude in affixing dates to sex crimes performed on young children. *See, e.g.*, *Commonwealth v. Niemetz*, 422 A.2d 1369, 1373 (Pa. Super. 1980) ("[W]e do not believe that it would serve the ends of justice to permit a person to rape and otherwise sexually abuse his child with impunity simply because the child has failed to record in a daily diary the unfortunate details of her childhood.").

Here, P.W., who was a young child during the first iteration of Nunez's abuse, provided testimony during the preliminary hearing that there were multiple instances of abuse perpetrated by Nunez around the time she was

- 14 -

"eight or nine[.]" Preliminary Hearing, 3/15/21, at 13.[6] These events involved Nunez sticking "his fingers in [P.W.'s] genital area." *Id*. P.W. also testified to two incidents that occurred in 2019 when she was "in high school" and around sixteen years of age where Nunez, *inter alia*, exposed himself to her. **See id**. at 18-19.

Based on the Commonwealth furnishing both the information obtained at the preliminary hearing as well as the contents of the forensic interview performed by Mission Kids, Nunez had requisite notice of the temporal elements associated with the crimes in which he had been charged. As such, Nunez has failed to demonstrate any deprivation associated with him having been denied a bill of particulars. Moreover, the Commonwealth provided sufficient information as to the dates associated with its charged offenses, consistent with the fact that Nunez was, at that juncture, alleged to have committed sexual acts on a young child that occurred approximately a decade prior to the charges being filed. Nunez is due no relief on this claim.

In his second issue, Nunez contests the testimony of P.W.'s babysitter, C.R., challenging, primarily, whether his verdict was against the weight of the evidence, while also arguing that C.R.'s testimony was improperly admitted,

_____

[6] P.W., at the preliminary hearing, thought that the abuse could have started in 2008, prior to her little brother's birth. **See** Preliminary Hearing, 3/15/21, at 12. However, if P.W. was eight or nine at the first incident, given that she was born in June 2002, that would have placed the first assault at some point between 2010 and 2012.

lacked credibility, and was contradictory and in that testimony's absence, the Commonwealth "did not present sufficient, credible evidence that [Nunez] had committed these crimes." Appellant's Brief, at 38.[7]

A new trial may be granted on the ground that the verdict is against the weight of the evidence only where the verdict was so contrary to the evidence that it shocks the trial court's sense of justice. *See Commonwealth v. Clemons*, 200 A.3d 441, 463 (Pa. 2019); *Commonwealth v. James*, 268 A.3d 461, 468 (Pa. Super. 2021); *Commonwealth v. Antidormi*, 84 A.3d 736, 758 (Pa. Super. 2014). Our review of the denial of a motion for a new trial based on weight of the evidence is correspondingly limited and premised on the concession that there was, in fact, sufficient evidence to sustain a verdict. We review whether the trial court abused its discretion in concluding that the verdict was not against the weight of the evidence, not whether the verdict, in this Court's opinion, was against the weight of the evidence. *Clemons*, 200 A.3d at 463-64; *Commonwealth v. Delmonico*, 251 A.3d 829, 837 (Pa. Super. 2021); *Commonwealth v. Windslowe*, 158 A.3d 698, 712 (Pa. Super. 2017).

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge.… One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict

---

[7] Nunez's comingling of issues concerning the weight of the evidence, the sufficiency of the evidence, and other, underdeveloped evidentiary questions in one section of his brief has substantially impaired our review.

was or was not against the weight of the evidence.

**Antidormi**, 84 A.3d at 758 (quoting **Commonwealth v. Clay**, 64 A.3d 1049 (Pa. 2013)) (brackets omitted).

The court admitted C.R.'s testimony as a prompt complaint witness. It is Nunez's belief that the Commonwealth used this testimony "to convince the jury that P[.]W[.] had told her version of events to a third party years before, in 2012, [when] P[.]W[.] [eventually] disclosed to her mother[ the same] on August 22, 2020." Appellant's Brief, at 40. Nunez "is asking this Court to look at the testimony without the admission of the babysitter who lacked all credibility and whose timeline fails to match the chronological facts of this case." **Id**.

To the extent that Nunez is challenging C.R.'s testimony as having been erroneously admitted as evidence of a "prompt complaint," which is an evidentiary question and not one of weight or sufficiency, we find that his argument has been waived for failure to provide *any* citations or analysis as to why her testimony did not fit under that auspice. **See, e.g.**, **Commonwealth v. McGhee**, 230 A.3d 1277, 1285 (Pa. Super. 2020) ("Where an appellant does not include citation to pertinent case law or other authority in support an argument, he or she waives the claim.").

Furthermore, while Nunez mentions sufficiency several times in this section, he has failed to "specify the element or elements upon which the evidence was insufficient." **Commonwealth v. McFarland**, 278 A.3d 369,

381 (Pa. Super. 2022) (citation omitted). "Such specificity is of particular importance in cases where, as here, the appellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt." *Commonwealth v. Brown*, 186 A.3d 985, 990 (Pa. Super. 2018) (citation omitted). Accordingly, without discussing any of the elements of the numerous charges that he was convicted of, Nunez has waived any sufficiency-related claim.

As to his weight claim, "[t]he weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) (citation omitted). When testimony is contradictory, its resolution is a matter for the factfinder. *See Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa. Super. 2000).

At trial, P.W. testified that Nunez first assaulted her when she was seven. *See* N.T., 9/12/22, at 143. On that date, Nunez went into her bedroom while he was touching himself and then eventually put his hand underneath her clothing, inserting his fingers into her vagina. *See id*. at 146-47. Nunez came back later that same evening to engage in the same acts. *See id*. at 149-50. On another day, Nunez climbed into bed with P.W., who had already been in the same bed as her baby brother. *See id*. at 152. Nunez then pulled down P.W.'s underwear and again put his fingers inside of P.W.'s vagina. *See id*. at 153. P.W. also testified to an additional incident, when she was eight or

nine, when she attempted to position her body to defend herself from Nunez, but Nunez, instead, was able to put his hands under her clothes and insert his fingers into P.W.'s vagina. ***See id***. at 154-58. While P.W. attempted to escape the situation via going into the bathroom and then her mother's room, Nunez attempted to pull down her underwear but P.W. managed to prevent Nunez from penetrating her again. ***See id***.

When P.W. was in high school, she observed Nunez watching pornography in the kitchen while touching his penis. ***See*** N.T., 9/13/22, at 9-10. On another occasion, Nunez went to retrieve a bowl from P.W.'s bedroom while "his pants were unzipped and his private part was just hanging out of there." ***Id***. at 11.

C.R.'s testimony established that she babysat P.W. in 2012. ***See id***. at 60. C.R. stated that P.W. informed her about Nunez's abuse, indicating that Nunez would "massage her and touch her." ***Id***. at 61. C.R. indicated that P.W. showed her on a doll that Nunez had been touched in "the buttocks, the vagina, and the chest." ***Id***. at 63. C.R. testified that she conveyed this information to P.W.'s mother. ***See id***. at 65. C.R. also made known that she called child protective services, but when that agency started to ask more questions, she got anxious and hung up the phone. ***See id***. at 65-66. To C.R.'s knowledge, child protective services never subsequently attempted to contact her. ***See id***. at 66.

The trial court found that the verdict did not shock its conscience, noting

that the verdict indicates that the jury clearly found P.W.'s testimony credible, which included various details regarding the assaults even if P.W. could not provide specific dates of the incidents. Trial Court Opinion, 9/13/23, at 37-38. The court observed that "[t]he defense effectively cross-examined P.W. regarding any inconsistencies in her testimony at trial, her Mission Kids interview and her testimony at the preliminary hearing." *Id.* at 37. Ultimately, the court noted that "[i]t was within the jury's discretion to determine which witnesses were credible and to determine how much weight to give the testimony." *Id.* at 37-38. Based upon our review, we find no basis to conclude that the trial court abused its discretion in concluding that the verdict reached in this matter was not against the weight of the evidence, and Nunez is afforded no relief at this claim.

In his third issue, Nunez challenges the discretionary aspects of his sentence. Accordingly, in our preliminary review of such a claim, we utilize the following precepts:

> Challenges to the discretionary aspects of sentence are not appealable as of right. *Commonwealth v. Leatherby*, 116 A.3d 73, 83 (Pa. Super. 2015). Rather, an appellant challenging the sentencing court's discretion must invoke this Court's jurisdiction by (1) filing a timely notice of appeal; (2) properly preserving the issue at sentencing or in a motion to reconsider and modify the sentence; (3) complying with Pa.R.A.P. 2119(f), which requires a separate section of the brief setting forth a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence; and (4) presenting a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S. § 9781(b), or sentencing norms. *Id*. An appellant must satisfy all four requirements. *Commonwealth v. Austin*, 66 A.3d 798, 808 (Pa.

Super. 2013).

***Commonwealth v. Miller***, 275 A.3d 530, 534 (Pa. Super. 2022), ***appeal denied***, 302 A.3d 626 (Pa. 2023).

Through our review of the record, Nunez has satisfied the first three jurisdictional prongs via his timely post-sentence motion, timely appeal, and Rule 2119(f) statement. Therefore, we must ascertain whether he has presented a substantial question.

This Court determines the existence of a substantial question on a case-by-case basis. ***See Commonwealth v. Diehl***, 140 A.3d 34, 44 (Pa. Super. 2016). However, a substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process. ***See id***. at 45. Moreover, we cannot look beyond the statement of questions presented and the prefatory Rule 2119(f) statement to determine whether a substantial question exists. ***See id***.

In his Rule 2119(f) statement, Nunez avers that he has been "sentenced to consecutive sentences for multiple crimes with an identical factual basis" and the trial court ignored mitigating evidence, such as his prior record score of zero. Appellant's Brief, at 24. Through a generous reading of this statement, Nunez is arguing that the court did not consider mitigating factors when it imposed an excessive sentence. This Court has adjudicated such contentions

as satisfying the "substantial question" inquiry. *See Commonwealth v. Perry*, 883 A.2d 599, 602 (Pa. Super. 2005).

For substantive challenges to the discretionary aspects of sentencing, we note our well-settled standard of review:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Bankes*, 286 A.3d 1302, 1307 (Pa. Super. 2022) (citation omitted). "[W]hen imposing sentence, the trial court is granted broad discretion, as it is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it." *Commonwealth v. Mulkin*, 228 A.3d 913, 917 (Pa. Super. 2020).

Nunez contests the fact that he was initially sentenced to an aggregate term of twenty-three to sixty-five years of incarceration in addition to a $5,000 fine, but then at resentencing, he received an imprisonment term of twenty-four years and nine months to fifty-six years in addition to a $15,000 fine. *See* Appellant's Brief, at 52. Nunez then calls his sentence, which at certain counts deviated from the sentencing guidelines, "overly punitive[.]" *Id*. at 58. Nunez concedes, however, that the trial court indicated the reasons behind its sentencing decisions, placing them both on the record at the time of resentencing and in its subsequent opinion written for the purposes of this

appeal. *See id*. at 57. Moreover, other than highlighting that resentencing yielded a larger minimum sentence by one year and nine months, he has not presented any authority to demonstrate that the court abused its discretion in arriving at its new sentencing scheme.[8]

At sentencing, a court is required to consider both the particular circumstances of the offenses and the character of the defendant. *See Commonwealth v. Taylor*, 277 A.3d 577, 593 (Pa. Super. 2022). Through consideration of these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics, and potential for rehabilitation. *See id*. However, when a pre-sentence investigation (PSI) report exists, we "presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Conte*, 198 A.3d 1169,

_____

[8] While Nunez observes that the trial court slightly increased his aggregate minimum term of imprisonment and fine upon resentencing, Appellant's Brief, at 24, 52, he does not raise a vindictive sentence claim in this appeal. Nevertheless, we observe that the presumption of vindictiveness would not attach in this case as the resentencing occurred upon the agreement of the parties and the court rather than following Nunez's exercise of a legal right to challenge his sentence or conviction. *See* N.T., 2/16/23, at 5; *Commonwealth v. Ali*, 197 A.3d 742, 761 (Pa. Super. 2018) (presumption of vindictiveness applies where defendant exercises legal right and resentencing is ordered, such as where convictions are overturned after successful defense appeal or trial court grants defendant's post-trial request for resentencing); *Commonwealth v. Robinson*, 931 A.2d 15, 24 (Pa. Super. 2007) (*en banc*), *overruled on other grounds by Commonwealth v. Prinkey*, 277 A.3d 554 (Pa. 2022) (no presumption of vindictiveness where court resentences defendant after granting Commonwealth motion for reconsideration of sentence).

1177 (Pa. Super. 2018). In other words, the very existence of a PSI report creates the presumption "that the court is aware of all appropriate sentencing factors and considerations, and where the court has been so informed, its discretion should not be disturbed." **Commonwealth v. Ventura**, 975 A.2d 1128, 1135 (Pa. Super. 2009) (citing **Commonwealth v. Devers**, 546 A.2d 12, 18 (Pa. 1988)).

Here, the court, *inter alia*, "considered the presentence investigation[.]" N.T., 2/16/23, at 41. Relevant to Nunez's claim, the court reflected on Nunez's life history, specifically emphasizing that he has had "no arrests or criminal convictions prior to the events that lead [the court to the point of sentencing him.]" **Id**. at 42. The court then painstakingly went through its reasons for crafting its sentence in the way that it did, indicating why it departed from the sentencing guidelines at certain counts. **Id**. at 48-57. Furthermore, the court provided, in writing, its reasons for deviating from the sentencing guidelines. **See** Written Reasons for Deviation from Sentencing Guidelines, 2/21/23.

We are unable to find any abuse of discretion committed by the court in arriving at its ultimate sentencing scheme. To the extent that Nunez suggests that this Court should revisit the particularities of the PSI report, placing a higher emphasis on certain components, we note the well-settled precept that we may not "reweigh sentencing factors and impose judgment in place of the sentencing court where the lower court was fully aware of all mitigating factors." **Commonwealth v. Lawrence**, 313 A.3d 265, 286 (Pa. Super.

- 24 -

2024) (citation omitted and some formatting altered). Accordingly, Nunez is due no relief on this claim.

In his fourth issue, Nunez contests the constitutionality of SORNA both facially and as it applies to him. At sentencing, Nunez was directed to register as a sex offender for the remainder of his life as a Tier III offender under Subchapter H of SORNA. *See* Sentencing Order, 2/16/23, at 2 (unpaginated); 42 Pa.C.S. § 9799.15. Nunez was not sentenced as a sexually violent predator. *See* Notification of Sentence, 2/16/23.

"A constitutional challenge to a sentencing statute presents a question of law, which we review *de novo*." *Commonwealth v. Eid*, 249 A.3d 1030, 1036-37 (Pa. 2021). As previously explained by this Court,

> SORNA was enacted in 2011 and became effective on December 20, 2012. Through Acts 10 and 29 of 2018, the General Assembly split Subchapter H of SORNA into a Revised Subchapter H and Subchapter I. Subchapter I addresses sexual offenders who committed an offense on or after April 22, 1996, but before December 20, 2012. *See* 42 Pa.C.S.[] §§ 9799.51-9799.75. Revised Subchapter H, which applies to offenders … who committed an offense on or after December 20, 2012, contains stricter requirements than Subchapter I. *See* 42 Pa.C.S.[] §§ 9799.10-9799.42.

*Commonwealth v. Muhammad*, 241 A.3d 1149, 1152 n.2 (Pa. Super. 2020).

Nunez bases his challenge on a 2022 decision of the Court of Common Pleas of Chester County in *Commonwealth v. Torsilieri*, which found that Subchapter H violated due process, the separation of powers doctrine, the prohibition on cruel and unusual punishment, and the right to a jury

determination of facts leading to criminal punishment. *See* Appellant's Brief, at 67 (stating that Nunez was "relying upon [the] conscientious and thorough analysis" of the Chester County *Torsilieri* court). However, subsequent to the briefing in this matter, our Supreme Court considered and rejected the Chester County court's rulings, concluding that Torsilieri had not met his heavy burden of showing that Subchapter H's irrebuttable presumption of a high rate of recidivism among adult sexual offenders violates the due process rights of sexual offenders. *See Commonwealth v. Torsilieri*, 316 A.3d 77, 97-100 (Pa. 2024). Further, after finding that Subchapter H is not punitive in nature, the Court concluded that the remaining constitutional challenges based upon separation of powers, the prohibition on cruel and unusual punishment, and the right to trial by jury lacked merit. *See id*. at 102-10.

Our Supreme Court's rulings in *Torsilieri* dispose of Nunez's claim. The reasoning of the Chester County court on which Nunez based his facial challenge to Subchapter H of SORNA has now been thoroughly rejected by our Supreme Court. *See id*. at 97-110. While Nunez also claims that the statute's irrebuttable presumption is unconstitutional as applied to him, his argument is based upon nothing more than his own expert's testimony at sentencing as to his low risk of recidivism, *see* N.T., 2/16/23, at 18-21, which our Supreme Court held in *Torsilieri* was insufficient by itself to overcome the presumption. *See Torsilieri*, 316 A.3d at 99 (rejecting Torsilieri's focus on "individualized recidivism risk" and finding that statistics showing likelihood of

sexual offenders to reoffend when looked at as a whole were enough to support the legislative presumption underlying Subchapter H); *cf. Muhammad*, 241 A.3d at 1157-60 (sustaining as applied challenge to Subchapter H registration based upon fact that defendant was convicted only of interference with custody of children with no sexual intent, had no prior record, and other factors). Appellant is therefore not entitled to relief on his SORNA constitutional challenge.

In addition, we must also address the Commonwealth's claim in its brief that Nunez was not properly subjected to lifetime registration and reporting requirements under Subchapter H and he should instead have been sentenced under Subchapter I. *See* Appellee's Brief, at 19-22. The Commonwealth asserts that each of the offenses that would have required Nunez to register as a lifetime offender under Subchapter H occurred between 2009 and 2011, prior to the operative date under the statute, December 20, 2012. While the Commonwealth notes that Nunez committed another SORNA-related offense, unlawful contact with a minor, that may have occurred after December 20, 2012, it contends that because the jury did not make a specific finding as to when that offense occurred—or specifically in this case whether the events occurred in Montgomery County when P.W. was in elementary school or Chester County when the victim was in high school, which would respectively place the crimes before or after the effective date—only the lesser requirements of Subchapter I may be applied to Nunez.

The Commonwealth relies on ***Commonwealth v. Alston***, 212 A.3d 526 (Pa. Super. 2019), which held that "when [a defendant's] offenses straddle the effective dates of Subchapters H and I of SORNA, he is entitled to the lower registration and reporting requirements of Subchapter I, absent a specific finding [by the factfinder] of when the offenses related to the convictions actually occurred." ***Id.*** at 530. ***Alston*** was based upon the assumption that Subchapter H was punitive and therefore held in accordance with ***Alleyne v. United States***, 570 U.S. 99 (2013), that any increase in the punishment imposed through the application of Subchapter H must be accompanied by a specific finding by the factfinder, beyond a reasonable doubt, that the offenses at issue occurred after December 20, 2012. ***See Alston***, 212 A.3d at 529-30. However, the assumption on which ***Alston*** relies was rejected by our Supreme Court's holding in ***Torsilieri*** that Subchapter H's registration requirements are **not** punitive in nature. ***See Torsilieri***, 316 A.3d at 103-10. The Supreme Court accordingly vacated our decision in ***Alston*** and remanded the case to the trial court for further consideration in light of ***Torsilieri***. ***See Commonwealth v. Alston***, 321 A.3d 868 (Pa. 2024) (*per curiam* order).

Nevertheless, while our caselaw no longer requires a specific factual finding by the jury of the date of the offense to support the designation as a Subchapter H registrant, there still must be evidentiary support for the sentence imposed. ***See Commonwealth v. Prinkey***, 277 A.3d 554, 562 (Pa.

2022) (sentence is illegal if it "was imposed without the fulfillment of statutory preconditions to the court's sentencing authority"); **Commonwealth v. Lowe**, 303 A.3d 810, 813 (Pa. Super. 2023) (legality of sentence issue is not subject to waiver and may be addressed by this Court even where not raised by appellant). Our review of the record confirms the Commonwealth's representation that the offenses that could have led to Nunez being found a Tier III lifetime reporter under Subchapter H, aggravated indecent assault and indecent assault of a child less than 13 years of age, all occurred before December 20, 2012. **See** N.T., 9/12/22, at 140, 143-58; 18 Pa.C.S. §§ 3125(a)(1), (7), 3126(a)(7); 42 Pa.C.S. §§ 9799.14(d)(7), (8), 9799.15(a)(3); **see also** 42 Pa.C.S. § 9799.55(b)(2)(i)(A) (providing that aggravated indecent assault conviction leads to lifetime reporting under Subchapter I).

However, it remains an open question as to whether Nunez could have been directed to report as a Tier II offender under Subchapter H based upon his unlawful contact with a minor conviction, as he was convicted of indecent exposure based upon acts occurring after December 20, 2012, and contact for the purpose of committing indecent exposure can support a conviction for unlawful contact with a minor. **See** N.T., 9/13/22, at 7-13; N.T., 9/14/22, at 82, 107, 111; 18 Pa.C.S. §§ 3127(a), 6318(a)(1); 42 Pa.C.S. § 9799.14(c)(5); **Commonwealth v. Aikens**, 168 A.3d 137, 138-39 & n.4 (Pa. 2017). In light of the ambiguity in the record as well as the fact that this issue

has not been properly briefed before this Court, we vacate Nunez's lifetime registration under Subchapter H and remand this matter to the trial court to hold a hearing to determine whether Nunez should be properly designated a registrant under Subchapter H, and for how long, or whether Nunez may only be subject to the requirements of Subchapter I.

In his final issue, Nunez identifies a purported agreement between him, the Commonwealth, and the lower court where "Counts 1 and 2 would merge for sentencing purposes." Appellant's Brief, at 67.

Relevant to this claim, Nunez was convicted of four total counts of aggravated indecent assault, with two pertaining to a lack of consent, 18 Pa.C.S. § 3126(a)(1), and two involving a child victim less than thirteen years of age, 18 Pa.C.S. § 3126(a)(7). Nunez received five-to-ten-year terms of incarceration at three of these offenses and no further penalty at the fourth. Prior to jury instructions, the court asked the Commonwealth: "[m]y understanding from the beginning of the case is that [the Commonwealth was] proceeding on two events of aggravated indecent assault?" N.T., 9/14/22, at 5. The Commonwealth responded in the affirmative. The Court went further: "[s]o even though there was testimony about more, you're only proceeding on two events?" *Id*. at 5-6. The Commonwealth agreed: "[r]ight, yes. There are two different subsections of aggravated indecent assault for each of the events." *Id*. at 6. The court then asked: "[s]o you would not be seeking - - assuming that [Nunez was] convicted of all four, you would not be seeking to

have him sentenced separately on four events. You would recognize that the crimes would merge, lack of consent and under 13?" *Id*. at 6. The Commonwealth responded: "I mean, I think I have to." *Id.* The Commonwealth, responding to the court's statement that they were actually discussing a sentencing issue, continued: "[b]ut, yes, I'm submitting that we have two counts." *Id*. The Court then replied: "[t]wo counts, okay. I think with that clarification, I'm comfortable, based on the evidence that was presented, I think it's appropriate to present two counts of each." *Id*. at 6-7. Notwithstanding this discussion, the jury was not instructed that it could only find Nunez guilty of aggravated indecent assault as to a maximum of two separate criminal acts, with two of the counts applying to each act.

Nunez avers that, based on his understanding of a supposed stipulation and/or the doctrine of merger, one of his three aggravated indecent assault sentences "should have merged," leaving only two sentences on those offenses. Appellant's Brief, at 68. Other than illuminating the discussion between the parties and the court, Nunez has not, however, pointed to any clear objection made on this issue or ruling made thereon by the trial court; indeed, at both sentencing hearings, Nunez's counsel agreed with the court that none of the counts would merge. *See* N.T., 12/12/22, at 9-10; N.T., 2/16/23, at 9. Nunez also fails to discuss the applicability of merger to his aggravated indecent assault sentences, failing to cite the elements of the

specific subjections of this offense of which he was convicted.[9]

Notwithstanding the minimal development of this claim, merger of criminal sentences is governed by Section 9765 of the Pennsylvania Sentencing Code, which provides that:

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. As such, "merger is appropriate only when two distinct criteria are satisfied: (1) the crimes arise from a single criminal act; and (2) all of the statutory elements of one of the offenses are included within the statutory elements of the other." *Commonwealth v. Kimmel*, 125 A.3d 1272, 1276 (Pa. Super. 2015) (*en banc*) (cleaned up).

---

[9] Nunez appends a second argument to this portion of his brief wherein he claims that the jury finding him guilty of Count 16, indecent exposure, was insufficiently proven at trial. *See* Appellant's Brief, at 69 ("[T]here is simply no place in the lengthy record where facts were presented to prove that [i]ndecent [e]xposure took place in Montgomery County."). Although this claim is also underdeveloped and potentially waived, as it appears that it has been raised for the first time in his brief on appeal, we note that there was sufficient evidence to establish indecent exposure in Montgomery County, which requires a person to expose his genitals "in any place where there are present other persons under circumstances in which he … knows or should know that this conduct is likely to offend, affront or alarm." 18 Pa.C.S. § 3127(a). With P.W.'s testimony establishing that Nunez walked into her room touching his penis while in Montgomery County, that act would qualify under the indecent exposure statute. *See* N.T., 9/12/22, at 145-46 (P.W. indicating that she could clearly see Nunez "using his hand to touch" his penis as he was walking into her bedroom prior to the first assault).

Merger is inapplicable in this case.[10] First, we note that it appears that the two subsections of aggravated assault each include distinct elements and therefore are not subject to merger. **See** 18 Pa.C.S. §§ 3125(a)(1), (a)(7) (requiring proof at subsection (a)(1) that the assault was committed "without the complainant's consent" and that "the complainant is less than 13 years of age" at subsection (a)(7)). More importantly, however, the three aggravated indecent assault convictions could not merge because they were based on separate criminal acts. Based on the testimony illustrated above, evidence was presented to support at least four discrete acts of aggravated indecent assault when P.W. was under the age of thirteen. When imposing sentence on the aggravated indecent assault charges, the trial court made clear that it was sentencing Nunez as to three separate incidents. **See** N.T., 2/16/23, at 45-48. Therefore, we find no merit to Nunez's final claim on appeal based upon the doctrine of merger.[11]

_____

[10] We observe that the Commonwealth concedes in its appellate brief that Nunez's "convictions for aggravated indecent assault, lack of consent, should have merged with his convictions for aggravated indecent assault, child under the age of 13." Appellee's Brief, at 18. Much like Nunez, the Commonwealth fails to explain how or why these crimes would merge for sentencing purposes.

[11] While the trial court appeared to indicate its assent to the Commonwealth's limitation of its case to two acts of aggravated indecent assault, no further action was taken to limit the jury's understanding of the charges and evidence, and the doctrine of merger does not provide grounds for the vacating of Nunez's sentence. To the extent that Nunez would argue that his trial counsel was ineffective for failing to take further action in the trial court to ensure that the Commonwealth was bound by its comments as it pertained to how Nunez

*(Footnote Continued Next Page)*

For the foreground reasons, we conclude that Appellant's lifetime Subchapter H SORNA registration must be vacated. In all other respects, we affirm.[12]

Judgment of sentence affirmed in part and vacated in part. Application for remand denied. Remanded for further proceedings. Jurisdiction relinquished.

This decision was reached prior to the retirement of Judge Colins.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/10/2025

---

should have been sentenced, our decision in this appeal is without prejudice to Nunez seeking post-conviction relief on this issue.

[12] Nunez filed an application in this Court to remand this matter to the trial court for "the correction of an illegal sentence" based the alleged insufficient evidence as to indecent exposure at Count 16 and to address the potential merger of one count of aggravated indecent assault. *See* Application for Remand to Correct Sentencing Issues and for Third Extension of Time to File Brief, 2/27/24, ¶ 5. As we have rejected Nunez's arguments on these issues in this decision, we also deny his application for remand.