2021 PA Super 256

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRAD A. JAMES | : | |
| | : | |
| Appellant | : | No. 1392 MDA 2020 |

Appeal from the Judgment of Sentence Entered July 6, 2020
In the Court of Common Pleas of Luzerne County Criminal Division at
No(s):  CP-40-CR-0004587-2017

BEFORE:   BENDER, P.J.E., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY BENDER, P.J.E.:                    **FILED: DECEMBER 22, 2021**

Appellant, Brad A. James, appeals from the judgment of sentence of an aggregate term of 27 to 54 months' incarceration, imposed after he was convicted by a jury of simple assault (18 Pa.C.S. §2701(a)(1)), recklessly endangering another person (REAP) (18 Pa.C.S. § 2705), and discharging a firearm into an occupied structure (18 Pa.C.S. § 2707.1(a)).   Appellant challenges the sufficiency and weight of the evidence to sustain his convictions.  After careful review, we affirm.

The trial court summarized the facts established at Appellant's jury trial, as follows:

> The eyewitnesses who testified at trial were Gina Longo, Edward Miller[,] and … Appellant.  … Longo was a former romantic partner of … Appellant and mother to their then approximately (7) year old child, A.J.  During the relationship, … Longo and … Appellant lived at 922 Scott Street in Wilkes-Barre City.  The residence at

---

[*] Former Justice specially assigned to the Superior Court.

922 Scott Street was built atop a large garage which fronted onto an intersecting street.  The mailing address for the garage is 35 Govier Street.  … Appellant and … Longo ended their relationship in 2011 and since that time[,] they were engaged in a lengthy and contentious custody action.

On the date of the incident which gave rise to this case, … Longo had brought their daughter A.J. from her home in Fort Washington, PA[,] to Wilkes-Barre[,] PA[,] for a scheduled custody exchange with … Appellant.  These exchanges had previously occurred in public at a local supermarket. … Longo characterized … Appellant's behavior at prior exchanges as hostile.

Upon arriving in Wilkes-Barre that day, … Longo and her daughter went to the garage and residence of Edward Miller, who … Longo described as a friend.  … Miller purchased the 922 Scott Street/35 Govier Street property from … Appellant after his relationship with … Longo ended.  From … Miller's garage, … Longo texted … Appellant and advised him that she was "at Eds."  In the same text message exchange, she asked … Appellant when he was expected to leave work so the former couple could meet at the custody exchange location.  … Longo sent two such text messages to … Appellant[,] but he did not text or call in response.

Instead, … Appellant drove to … Miller's residence and began walking to the then open garage.  Seeing this, … Miller closed and locked his garage doors. … Appellant approached the door and tried the knob to open it.  Finding the door locked, he began to pound his fist and kick at the door.  Ultimately, the door frame broke.  As the door came open, opening into the garage, … Miller and … Appellant met and immediately began to fight.  … Miller had picked up a hammer from the garage and he tried to hit … Appellant over the head with it as the pair struggled at the threshold.  During the fight, which quickly spilled into the driveway away from the door, a firearm holstered under the waistband of … Miller found its way into the hands of … Appellant.

Appellant took the gun by the barrel in his left hand, then moved it to hold the grip in his right.  He stepped back, put his finger inside the trigger guard[,] and fired at pointblank range toward … Miller and his garage.  … Appellant testified that he fired the shot by accident.

After the shot was fired, … Miller retreated into his garage where he lay on the floor holding the now broken, and hence unlockable, door closed with his foot while asking … Longo to call 911.

Fortunately, he discovered that he was not injured. The bullet passed through the front breast pocket of his flannel shirt narrowly missing his body. Later that same day[,] a piece of a projectile[] was recovered from the inside of the garage where … Longo and her daughter cowered in panic.

Officer Alan Gribble of the Wilkes-Barre City Police Department responded to the scene. He first encountered … Appellant holding the gun in his open hand. … Appellant surrendered the firearm and cooperated with Officer Gribble[,] who he knew from prior interactions when the two would discuss classic cars at … Appellant's auto shop. Officer Gribble then proceeded to watch … Miller's video surveillance footage which recorded the entire incident and was later admitted into evidence as Commonwealth's Exhibits 10(a) and 10(b). … Appellant was subsequently arrested and charged with aggravated assault[], burglary, simple assault, three counts of [REAP,] and discharge of a firearm into an occupied structure.[1]

\*\*\*

Miller testified that he purchased his garage and residence from … Appellant a few years prior to the shooting. The property was on a corner lot and it included an 1,800 square foot home over an 1,800 square foot main garage with a second garage addition attached to that. The corner lot property had two mailing addresses, [with] the garage located at 35 Govier Street, and the residence[,] which fronted on the intersecting street[,] with an address of 922 Scott Street. There was no opening or door to access the interior of the garage from the residence. Similarly, there was no access between the main garage and the garage addition. Prior to selling the property to … Miller, … Appellant operated a motorcycle shop from the garage where this incident occurred. … Miller had on prior occasions made purchases from … Appellant at that motorcycle shop.

\*\*\*

Appellant testified that he was "upset" that … Longo had taken their daughter to … Miller's residence and garage. He agreed that he went to … Miller's garage, tried the knob to open the door and finding it locked, he proceeded to pound on the door. When the

---

[1] Appellant was ultimately acquitted of aggravated assault and burglary.

- 3 -

occupants did not open the door in response to his pounding on it, he walked toward … Longo's car and began to use his phone to take pictures of the license plate and vin number on her vehicle. He held the camera on his phone up to the garage window to photograph the occupants inside. He went back to the door and checked the knob again only to find it remained locked. Then he gave the door a "toe kick." At that[,] … Appellant said the door opened so fast that he was pulled inside.

Appellant testified that he was met at the now open door by … Miller holding a hammer. He continued, saying[,] "I don't know exactly what happened." When asked again on direct[-] examination if he realized that he pulled the trigger[,] he said that it, "happened so fast, it was like a car crash. I didn't have any idea." Next, he said that the gun "just went off as he was starting to aim." He was asked again how the gun went off and he said, "[a]ccidentally[.]"

[Appellant] agreed that he owned eighteen firearms, that he was experienced with handling them, and that he had fired handguns prior to the incident, including a Glock. He agreed that he was right[-]handed. He acknowledged and explained the text messages between him and Gina Longo. He also conceded that he was not invited to … Miller's garage and residence on that day.

∗∗∗

Corporal Gober of the Pennsylvania State Police was offered as an expert firearm and tool mark examiner. Corporal Gober testified that he examined the firearm, a Glock model 27 .40 caliber handgun, one spent .40 caliber shell casing, and a bullet fragment, particularly the steel jacket from a mutilated bullet. He was not able to state with certainty whether the mutilated bullet jacket was fired from the Glock .40 model 27 that he examined.

Corporal Gober also examined the firearm and subjected it to a drop test to determine whether the gun could discharge without pressing the trigger. The test determined that the firearm did not discharge during the testing and was highly unlikely to discharge without pressing the trigger. He said the gun was functioning properly and that it was "highly unlikely" that it would discharge upon being dropped. He also pointed out that the Glock 27 has a safety such that the gun will not fire unless a second trigger/lever in front of the trigger is also depressed.

> The [t]rooper next examined the amount of pressure which had to be applied to the trigger before the gun would discharge and fire the projectile. His testing also determined that 7.6 pounds of pressure had to be applied to the trigger before the gun would fire. He said that this trigger pull weight was "about right where it should be."

Trial Court Opinion (TCO), 1/29/21, at 4-15 (footnotes and citations to the record omitted).

Based on this evidence, Appellant was convicted of simple assault, REAP, and discharging a firearm into an occupied structure. He was acquitted of all other charges. On July 6, 2020, the court sentenced Appellant to the aggregate term set forth *supra*. He filed a timely post-sentence motion, which the court subsequently denied.[2] Appellant then filed a timely notice of appeal, and he also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court thereafter filed its Rule 1925(a) opinion on January 29, 2021. Herein, Appellant states three issues for our review:

> [I.] Was the evidence sufficient to prove beyond a reasonable doubt that [Appellant] discharged a firearm into a structure that was adapted for overnight accommodations of persons or used for the carrying on of a business therein at the time of the incident to sustain his conviction for [d]ischarging a [f]irearm into an [o]ccupied [s]tructure under 18 Pa.C.S.[] § 2707.1?
>
> [II.] Did the [t]rial [c]ourt abuse its discretion in finding that the verdict of guilty of [d]ischarging a [f]irearm into an [o]ccupied [s]tructure was not against the weight of the evidence?

---

[2] We note that the trial court misstates that Appellant filed his post-sentence motion on September 14, 2020. **See** TCO at 1. However, the docket shows that Appellant's motion was filed on July 14, 2020.

- 5 -

[III.] Was the evidence sufficient to prove that the discharge of the firearm by [Appellant] was not the result of a mistake or accident to sustain his convictions for [s]imple [a]ssault, [REAP,] and [d]ischarg[ing] … a [f]irearm into an [o]ccupied [s]tructure?

Appellant's Brief at 2.

Appellant first argues that the evidence was insufficient to sustain his conviction for discharging a firearm into an occupied structure. Our standard of review of this is as follows:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno,*** 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. ***Commonwealth v. Hartzell,*** 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno, supra*** at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

"A person commits an offense if he knowingly, intentionally or recklessly discharges a firearm from any location into an occupied structure." 18 Pa.C.S § 2707.1(a). An "occupied structure" is defined by the statute as "[a]ny structure, vehicle or place adapted for overnight accommodation of persons or for carrying on business therein, whether or not a person is actually present." 18 Pa.C.S. § 2707.1(d).

In this case, Appellant claims that the garage into which he fired the gun did not constitute an occupied structure. Appellant argues that the garage was a separate structure from Miller's residence. He stresses that the two

properties had different addresses. Additionally, "[t]here was no direct access from the house to the garage," and "[t]o get to the garage from the house, a person would have to walk around the corner of the street and come into the driveway." Appellant's Brief at 12-13. Appellant acknowledges that "Miller referred to 35 Govier Street and 922 Scott Street as 'collectively being his home[,']" but he stresses that Miller also stated that the "properties were 'separate[.']" *Id.* at 13. Thus, Appellant insists that the garage is a separate structure from the house and, consequently, we must assess whether the garage, itself, was 'adapted for overnight accommodation' to make it an 'occupied structure' under the statute. In arguing that it was not an occupied structure, Appellant contends that there was no evidence "that the garage contained bedding, furniture, running water, refrigerator, bathroom, heating and mechanical equipment[, or] other belongings common to a residential structure." *Id.* Therefore, he concludes that the garage was not 'adapted for overnight accommodation' and cannot be considered an 'occupied structure.'

We cannot agree with Appellant's argument. This Court has explained that "[t]o determine whether a structure is adapted for overnight accommodation, a court considers 'the nature of the structure itself and its intended use, and not whether the structure is in fact inhabited.'" *Commonwealth v. Rivera*, 983 A.2d 767, 769-70 (Pa. Super. 2009) (quoting *Commonwealth v. Nixon*, 801 A.2d 1241, 1247 (Pa. Super. 2002) (holding that an unoccupied row-house, undergoing renovation, that

had no electricity or running water, constituted structure adapted for overnight accommodation)).

In **Rivera**, this Court deemed the evidence sufficient to prove that an attached basement was an 'occupied structure' under the burglary statute, 18 Pa.C.S. § 3501. In reaching our decision, we began by observing that,

> [r]egarding whether a basement accessed only through an exterior entrance is a place adapted for overnight accommodation, other jurisdictions interpreting similar statutory provisions have held that an attached basement is included in the definition of a place adapted for overnight accommodation. **See State v. Maykoski**, 583 N.W.2d 587, 588–89 (Minn. 1998) (holding basement built as part of house was part of dwelling, although occupant had to exit his home to access basement); **Stewart v. Commonwealth**, 793 S.W.2d 859, 861 (Ky. App. 1990) (holding basement accessible only from exterior of house was part of "dwelling" within meaning of burglary statute, where owner had laundry room, refrigerator, and workshop in basement); **Burgett v. State**, 161 Ind. App. 157, 314 N.E.2d 799, 803 (1974) (stating: "Basements are located directly under the living area of a residence and are used for a variety of purposes connected with family living, such as storage of various household items, location of hearing and mechanical equipment, and laundering of clothing. Being under the same roof, functionally interconnected with and immediately contiguous to other portions of the house, it requires considerable agility to leap over this fulsome interrelationship to a conclusion that a basement is not part of a dwelling house because no inside entrance connects the two").

**Id.** at 770. The **Rivera** panel then explained that,

> [t]he complainant's house contains three apartments, all of which are occupied. The basement sits below the apartments under the same roof, and the complainant uses it to store personal belongings. The fact that the basement is accessible only through an exterior entrance does not sever it from the rest of the house. Moreover, the basement contains a bed, television, portable radio, and washing machine. The basement is habitable. As the basement is functionally connected to the rest of the house and

habitable, it meets the definition of a "place adapted for overnight accommodation." *See* 18 Pa.C.S. § 3502.

*Rivera*, 983 A.2d at 771.

In line with *Rivera*, we conclude that the fact that Miller's garage has a separate entrance does not sever it from the rest of the house. Instead, the garage is part of the residential structure as a whole, and is akin to an attached basement. For instance, the garage is directly beneath Miller's living quarters, and under the same roof as the rest of Miller's home. Additionally, the evidence indicated that Miller uses the garage as part of his residence. Specifically, Miller was visiting with Longo and A.J. inside the garage when Appellant arrived at the scene.[3] The garage also contains a chair and a couch, further indicating that it is used as part of Miller's home. *See* N.T. Trial, 1/21/20, at 63. Miller also testified to as much when he explained that, although the garage has a separate "business address" from his residence, it is "one contiguous parcel," and that the residence and the garage are "collectively" his home. *Id.* at 114. Given the totality of this evidence, the jury was free to conclude that the garage was part of the structure containing

---

[3] We need not reach the question of whether the court erred by concluding that the evidence was sufficient to prove the structure was occupied because it was, in fact, occupied at the time of the shooting. We only consider the presence of Miller, Longo, and A.J. in the garage as circumstantial evidence supporting that the garage was part of the residential structure, which was adapted for overnight accommodation.

Miller's residence, which constitutes an 'occupied structure' as defined by the statute.[4,5]

Appellant next contends that the jury's verdict was contrary to the weight of the evidence.

> A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well[-]settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

_____

[4] Appellant unconvincingly contends that the Commonwealth conceded that the garage was not an "occupied structure" by charging Appellant in the criminal information with burglary of a structure not adapted for overnight accommodations. *See* Appellant's Brief at 15. As the Commonwealth points out, Appellant "has cited no authority for his claim that a [c]riminal [i]nformation acts as an 'admission' for purposes of a challenge to [the] sufficiency of the evidence." Commonwealth's Brief at 40. Moreover, the criminal information was not stipulated to, or admitted at trial. Consequently, it does not constitute evidence or an admission by the Commonwealth.

We also do not examine Appellant's claim that the Commonwealth's using the address of the garage in the charging documents precludes us from considering whether the garage and Miller's residence are attached. *See* Appellant's Reply Brief at 1-2. Appellant raised this argument for the first time in his reply brief and, thus, it is waived. ***See Commonwealth v. O'Berg***, 880 A.2d 597, 599 n.2 (Pa. 2005).

[5] Based on our conclusion, we need not address the trial court's alternative decision that the garage was adapted for the carrying on of a business at the time of the incident.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations and internal quotation marks omitted).

Here, the thrust of Appellant's weight claim is a reiteration of his argument that the court erred by concluding that the garage was an 'occupied structure.' We will not reiterate our above discussion of how the evidence proved that the garage was part of Miller's residence and, thus, constituted an occupied structure for purposes of the statute. Appellant's weight claim warrants no relief.

Next, Appellant claims that the evidence was insufficient to support any of his crimes because the Commonwealth failed to prove that he fired Miller's gun intentionally, knowingly, or recklessly.[6] Appellant contends that, instead, the evidence demonstrated that the shooting was accidental. In support, he points to his own trial testimony "that when the shot was fired[,] he did not know that Miller's gun was loaded or that he actually pulled the trigger causing the gun to discharge[,] and that his only intent was to scare Miller in order to prevent him from continuing his attack with a deadly weapon." Appellant's Brief at 22. According to Appellant, numerous factors supported that the

---

[6] The crime of simple assault requires that one "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]" 18 Pa.C.S. § 2701(a). For the offense of REAP, the Commonwealth must prove a person "recklessly engage[d] in conduct which place[d] … another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705. To have the *mens rea* for the crime of discharging a firearm into an occupied structure, the individual must act knowingly, intentionally, or recklessly. 18 Pa.C.S. § 2701.1(a).

shooting was accidental, including that the fight lasted only 18 seconds, that he only fired one shot, he did not flee the scene, and he was compliant when police arrived. *See id.* at 26-27. Appellant also points to certain aspects of the gun as supporting his claim that it fired accidentally, such as "the passive safety which could be disengaged simply by pulling the trigger[,] … the short trigger pull distance of 0.49 inches[, and the] average trigger pull weight of 7.6 [pounds,] which is 2.4 [pounds] less than what the [New York City] police department uses for its Glock pistols to prevent accidental discharge by trained police officers[.]" *Id.* at 26.

Appellant's arguments are unconvincing. First, the jury was free to reject Appellant's testimony that the gun fired accidentally. *See Commonwealth v. Crawford*, 718 A.2d 768, 772 (Pa. 1998) ("The determination of the credibility of a witness is within the exclusive province of the jury."). Second, the Commonwealth presented sufficient evidence to prove that Appellant shot the weapon intentionally. For instance, Miller testified that Appellant was irate when he arrived at Miller's home. *See* N.T. Trial at 136. Appellant pounded and kicked on the locked door of the garage until the door frame broke. *Id.* at 137. Appellant and Miller then physically struggled. *Id.* at 141. Appellant grabbed Miller's gun with his left hand, and then switched the gun to his right hand. *Id.* He stood and braced the side of the gun with his left hand as he aimed the weapon at Miller. *Id.* Appellant then fired the gun. *Id.* at 138. Appellant also admitted that he was an experienced gun owner and that, at the time of the shooting, he owned 18

guns, including "a few handguns." *Id.* at 409. He also testified that he has fired a Glock handgun before. *Id.* at 403. Additionally, the Commonwealth's evidence demonstrated that Miller's gun did not fire unless the trigger was pulled, that the gun was functioning properly, and that the "trigger pull weight" was normal. *See id.* at 248-49. Given this evidence, the jury was free to reject Appellant's claim that the gun accidentally fired and conclude, instead, that Appellant intentionally pulled the trigger.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/22/2021