J-S12004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA    :   IN THE SUPERIOR COURT OF
           :   PENNSYLVANIA
           :
      v.            :
           :
           :
JAMES REED JR.            :
           :
      Appellant            :    No. 1770 EDA 2025
           :

Appeal from the Judgment of Sentence Entered May 12, 2025
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0002526-2023

COMMONWEALTH OF PENNSYLVANIA    :   IN THE SUPERIOR COURT OF
           :   PENNSYLVANIA
           :
      v.            :
           :
           :
JAMES E. REED JR.            :
           :
      Appellant            :    No. 1771 EDA 2025
           :

Appeal from the Judgment of Sentence Entered May 12, 2025
In the Court of Common Pleas of Chester County Criminal Division at
No(s): CP-15-CR-0000527-2024

BEFORE: McLAUGHLIN, J., SULLIVAN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:           **FILED MAY 11, 2026**

      James E. Reed, Jr., appeals from the judgment of sentence entered on

two separate dockets following his convictions for four counts of delivery of a

controlled substance, three counts of possession of a controlled substance

_____

[*] Retired Senior Judge assigned to the Superior Court.

with intent to deliver ("PWID"), three counts of criminal use of a communication facility, seven counts of possession of a controlled substance, and one count of drug delivery resulting in death.[1] He challenges the sufficiency and weight of the evidence and the discretionary aspects of his sentence. We affirm.

On June 17, 2023, "[o]fficers from the Phoenixville Borough Police Department responded to the residence of James Nelson [('decedent')]." Trial Ct. Order, filed June 11, 2025, at 1 n.1. They pronounced decedent dead at the scene. The cause of death was an overdose of fentanyl, methamphetamine, and xylazine.[2] *See, e.g.*, N.T., Dec. 12, 2024, at 15, 17, 88.

The trial court conducted a jury trial.[3] Detective Jason Komorwski testified that he went to the scene on the morning of decedent's death. N.T.,

_____

[1] 35 P.S. §§ 780-113(a)(30), 18 Pa.C.S.A. § 7512(a), 35 P.S. § 780-113(a)(16), and 18 Pa.C.S.A. § 2506(a), respectively.

[2] Forensic toxicologist Ayaka Chan-Hosokawa testified that "Xylazine is a[n] FDA approved veterinary analgesic or sedative that's used in large animals. It is not approved for human use." N.T., Dec. 12, 2024, at 16. She stated that "in the last few years, especially in the Philadelphia suburb area, we have seen . . . Xylazine mixed in elicit fentanyl." *Id.*

[3] The court consolidated two cases for trial. On docket number CR-2526-2023 ("docket 2526"), trial proceeded on three counts of delivery of a controlled substance (cocaine), one count of PWID (cocaine), two counts of criminal use of communication facility, and four counts of possession of a controlled substance (cocaine). On docket number CR-527-2024 ("docket 527"), trial proceeded on one count each of drug delivery resulting in death, delivery of a controlled substance (fentanyl), and criminal use of communication facility,
*(Footnote Continued Next Page)*

- 2 -

Dec. 10, 2024, at 144. During his investigation, he collected the decedent's cellular telephone. *Id.* at 146. Also, the decedent's girlfriend, Adina Rowan, contacted the police twice when she found clear bags with white powder residue in decedent's possessions. *Id.* at 116-18; 139; N.T, Dec. 11, 2024, at 92. The police collected the bags. *Id.*

Detective Thomas Hyland testified about the investigation into decedent's death. N.T., Dec. 11, 2024, at 6-7. He said that when the officers at the scene read him the phone numbers that last had contact with the decedent, he "immediately recognized the number . . . that was saved [in decedent's phone] as Lil U" as a number that Reed had been using. *Id.* at 7. He explained that he had been investigating Reed and knew he frequently changed phone numbers through an application that "has the ability to make calls and texts from a different phone number." *Id.* at 7-8. Through that investigation, Detective Hyland knew that the number in the phone for "Lil U" was "the newest number that [Reed] was using at that time[.]" *Id.* at 8.

He also testified that when he removed the outer case from decedent's phone, a bag that "was consistent with how heroin and fentanyl are packaged" fell out. *Id.* at 10. He stated the bag was a white wax paper bag and had a stamp on it that said, "mega millions." *Id.* The parties stipulated that the "white glassine bag stamped mega millions containing white powder . . . was

_____

two counts of PWID (methamphetamine and cocaine), and three counts of possession of a controlled substance (methamphetamine, cocaine, and fentanyl).

analyzed and confirmed to contain fentanyl and Xylazine." *Id.* at 17. They further stipulated that "[t]he DNA swabs collected from the white glassine bags stamped mega millions were submitted and analyzed and were confirmed to contain one full single source male profile that matche[d] the DNA profile of [the decedent] and [did] not match the DNA profile of James Reed." *Id.* at 18.

Detective Hyland testified that as part of a separate investigation, they had started to look at Reed in early June 2023. *Id.* at 22. He said that as part of that investigation they conducted a controlled buy on June 1, 2023 through a confidential informant. *Id.* at 28. He testified that he was with the informant when he or she communicated with Reed through text messages and a phone call, and he provided the informant with cash. *Id.* at 29. He stated he dropped off the confidential informant a couple of blocks from the meeting location and did not see the hand-to-hand transaction, but another officer did. *Id.* at 30-31. Detective Hyland testified that the confidential informant returned with a controlled substance, which the parties stipulated was cocaine. *Id.* at 32, 35.

Detective Hyland testified that they conducted two more controlled buys, both on June 20, 2023. *Id.* at 35-36. He stated that he did not observe the transactions, but another detective did. Detective Hyland testified he drove the confidential informant close to the meeting location, and the confidential informant returned with controlled substances that the parties stipulated were cocaine. *Id.* at 40-43, 44-48.

Detective Michael Kinsman testified that for the controlled buy on June 1, 2023, he was in a vehicle about a block west of the target's residence. *Id.* at 132. He stated he observed the informant walk to a southeast corner and Reed come out the front door of a home and walk directly to the informant. *Id.* at 133-34. Detective Kinsman testified that Reed and the informant had a brief conversation, and he observed Reed and the informant conduct a hand-to-hand transaction. *Id.* at 134. On cross-examination, he acknowledged he could not "immediately identify . . . the objects specifically or the exact quantity." *Id.* at 136-37. He stated he had binoculars. *Id.* at 137.

Detective Oscar Rosado testified regarding the two controlled buys on June 20, 2023. *Id.* at 141. He stated he was in a vehicle with binoculars. *Id.* He said that for the first controlled buy, he observed the informant walk to the meet location and Reed exit the driveway of his residence and walk toward the meet intersection. *Id.* at 142. He testified he drove to their location and observed a hand-to-hand transaction, after which Reed returned to his street. *Id.* He testified the second control buy was similar to the first, but he did not need to relocate his vehicle to observe this transaction. *Id.* at 143. He said he "saw a hand-to-hand, small talk, then [Reed] walked back to [his residence]." *Id.* On cross-examination, he explained that he moved his vehicle during the first controlled buy because he thought the meet location was at a different corner, and when the informant arrived, he realized a building blocked his view and moved his vehicle. *Id.* at 144. He testified he was able to see Reed and the informant after he moved the vehicle, he was at a "stop sign and [he]

looked to [his] right, [he] observed [Reed] and the informant, then [he] started moving [because he] didn't want to park there for too long, [he] saw them moving south or towards their direction and that's when [he] saw the hand-to-hand." *Id.* at 144-45. He testified he could not see what was in their hands. *Id.* at 148.

Detective Hyland testified that when Reed was arrested he had on his person a cross-body satchel and a cell phone. *Id.* at 49. The detective stated that when he called the number used by the informant for the last two controlled buys, the number of the phone the detective used appeared on Reed's phone screen. *Id.* at 49-50. The parties stipulated that the satchel contained numerous bags of crack cocaine and marijuana. *Id.* at 50-51.

Detective Hyland next testified about a search warrant executed at a residence where Reed spent time. During the first search, the police did not discover any evidence. *Id.* at 55. They obtained a second warrant for the residence after they intercepted a phone call between Reed and a man named Antonio Pittman that suggested that they had failed to discover a safe that was in the house. *Id.* at 77.[4] When they executed the second warrant, they found a safe. *Id.* at 78. It contained, among other things, scales, items used

---

[4] During the call, Reed and Pittman discussed that some of the items in the safe belonged to "Bev." Exh. 25 at 2-3. Reed stated, "Yeah, that's her lane yeah. Yup. And then I think it's like ten jawns of tree or something like that, and then the rest of it empties [in] our lane." *Id.* at 3. Detective Hyland testified that Bev "was known to be a methamphetamine dealer" so he "assumed" her "lane" was the methamphetamine and because he had arrested Pittman for cocaine distribution, he believed that was the other "lane." N.T., Dec. 11, 2024, at 75-76.

to prepare crack cocaine, knotted baggies, methamphetamine, and cocaine. *Id.* at 85-87. Further, he testified there was no identifiable DNA on the packaging located in the safe. *Id.* at 95.

Detective Hyland testified that they had learned from the decedent's girlfriend that the decedent hid his addiction and would delete items from his phone. *Id.* at 19. He stated that they conducted a forensic download of the phone, which could have potentially retrieved deleted messages or content, and obtained the toll records for decedent's phone provider. *Id.* at 19-21. He testified that toll records "show all the transactions of calls and texts to and from a particular number, as well as . . . cell site location and things of that nature." *Id.* at 156-57.

Detective Hyland testified they did not find any text messages on the decedent's phone that would indicate drug activity. *Id.* at 160. However, he said they did retrieve from Reed's phone text messages between Reed and decedent. *Id.* at 161. He stated that on June 12, 2023, the decedent texted Reed that he "need[ed] two," which Detective Hyland opined meant that the decedent needed two bags of something. *Id.* at 162-64. He said that in subsequent text messages that day, Reed said he was in Pottstown and had "one left though if you" want it and "[m]y other didn't come today," and the decedent said he wanted it and would "hit [Reed] up" when he was done cleaning. *Id.* at 165-66.

Detective Hyland testified that the following day, June 13, the decedent texted Reed, "I know you don't have any ice left. I'm trying to grab some D."

*Id.* at 168. Detective Hyland stated that ice is a slang word for methamphetamine and D is an abbreviation for dope or slang for heroin fentanyl. *Id.* The detective also said that in response to texts from decedent, Reed stated, "I'm trying to get it homie"; the decedent responded, "Trying to get what? The D or the ice?" Reed replied, "I'll call you later." After the decedent sent numerous other texts, Reed responded, "I got cement, tree, and D," and the decedent said he wanted "to grab a couple D." *Id.* at 168-71. Detective Hyland said that cement meant hard crack cocaine, tree was marijuana, and D was heroin fentanyl. *Id.* at 171.

Detective Hyland testified that on June 14 the decedent texted Reed that he "want[ed] to grab a couple more of the D from [Reed]," Reed responded that he was at Phoenixville Hospital, and the two talked by phone twice. *Id.* at 172. The detective stated the decedent then texted Reed, "when you come out walk straight and you will see me." Reed texted, "I'm outside bro WYA," and the decedent responded, "if you came out the front door, you just have to walk straight through and I'm right there, right next to the little set of steps leading towards Nutt Road," which is near Phoenixville Hospital. *Id.* at 174. Detective Hyland further pointed out that there was another call between the two. *Id.* at 175.

Detective Hyland testified that the next communication was on June 16, from Reed to the decedent saying, "yo, bro, I got the ice back" and a second saying, "yo bro." *Id.* The detective stated that Reed also attempted to call the

decedent and, on June 18, Reed texted the decedent, "yo, bro, what's going on? You good?" *Id.*

Detective Hyland also testified about a video shown to the jury that showed Reed on June 14, 2023 standing outside the Phoenixville Hospital entrance. In the video, after he received a text message, he proceeded to walk to a white pick-up truck operated by the decedent. *Id.* at 177-78. Detective Hyland stated Reed got in the vehicle, which pulled away and circled the area. *Id.* at 178-88. Detective Hyland testified that it was typical during street-level sales for a seller to get into a buyer's vehicle, like they were getting a ride, and then be dropped off at a separate location and walk back. *Id.* at 188. The detective pointed out that when Reed walked back to the hospital, he had the cross-body satchel found with him when they arrested him. *Id.* at 189-90.

Detective Hyland stated they reviewed all other phone numbers in the decedent's phone, and all were "his regular contacts," meaning co-workers, family, and friends. *Id.* at 191. He also reviewed the toll records for the decedent's phone for June 14 to June 17, the day decedent died, and concluded the decedent communicated with his "regular acquaintances; family members, [his girlfriend], and co-workers." *Id.* at 194.

Detective Hyland testified that in reviewing Reed's phone, he found a text message to "Frank from Douglassville" on June 5, 2023, which stated "mega millions came back bro. He litty right now too bro ham." *Id.* at 195-96. He further testified that in a phone call between Reed and Beverly Barl,

Reed said "I'm trying to figure out is [the decedent] really dead. Is - if he's really dead then I will be in some deep shit." Exh. 44 at 1.

On cross-examination, Detective Hyland agreed that Reed and the decedent "were in communication on pretty much a daily basis." *Id.* at 202. Detective Hyland agreed they were in communication on June 5, and Reed did not tell the decedent through text message about mega millions, but noted there was a phone call that day. *Id.* at 204-205.

A jury convicted Reed of the above-referenced offenses. The court sentenced him to an aggregate sentence of 15 to 30 years' incarceration on docket 527 and an aggregate sentence of five to 10 years' consecutive incarceration on docket 2526. His total aggregate sentence was 20 to 40 years' incarceration. Reed filed a post-sentence motion, which the court denied. Reed appealed.

Reed raises the following issues:

> I. Was sufficient evidence presented to support a conviction on Drug Delivery Resulting in Death, 18 Pa.C.S.A. §2506 (a), in docket CR-527-2024? Specifically, was there sufficient evidence presented to show [Reed] delivered the controlled substance that caused decedent's death?
>
> II. Was sufficient evidence presented to support a conviction on Delivering a Controlled Substance (fentanyl), 35 Pa.C.S.A. §780-1 13 (a)(30), in docket CR-527-2024? Specifically, was there sufficient evidence to show [Reed] delivered fentanyl to decedent on June 14, 2023?
>
> III. Was sufficient evidence presented to support a conviction on Possession of a Controlled Substance (fentanyl), 35 Pa.C.S.A. §780-113 (a)(16), in docket CR-527-2024? Specifically, was there sufficient evidence to show [Reed] possessed fentanyl on June 14, 2023?

IV. Was sufficient evidence presented to support a conviction on Possession with Intent to Deliver Controlled Substance (methamphetamine), 35 Pa.C.S.A. §780-113 (a)(30) in docket CR-527-2024? Specifically, was there sufficient evidence to show [Reed] possessed methamphetamines?

V. Was sufficient evidence presented to support a conviction on Possession of a Controlled Substance (methamphetamine), 35 Pa.C.S.A. §780-113 (a)(16) in docket CR-527-2024? Specifically, was there sufficient evidence to show [Reed] possessed methamphetamines?

VI. Was the jury's verdict against the weight of the evidence presented on Counts 1, 2, 3 (relating to Delivering a Controlled Substance, 35 Pa.C.S.A. §780-113 (a)(30)) and Counts 7, 8, and 9 (relating to Possession of a Controlled Substance, 35 Pa.C.S.A. §780-113 (a)(16)) in docket CR-2526-2023?

VII. Did the trial court abuse its discretion in imposing an aggregate sentence of twenty (20) years to forty (40) years' confinement, a sentence which is "unlikely to end during the defendant's natural life span or [will] perpetually subject [the defendant] to the discretion of the Board of Probation and Parole" a concept disapproved of in **Commonwealth v. Coulverson**, 34 A.3d 135, 148 (Pa. Super. 2011)?

VIII. Did the trial court abuse its discretion imposing 20-40 years' confinement considering the sentence fails to address [Reed's] rehabilitative needs and fails to account for mitigating circumstances?

Reed's Br. at 4-5 (footnote omitted).

Reed's first five issues challenge the sufficiency of the evidence. The sufficiency of the evidence is a question of law. Therefore, "[o]ur standard of review is *de novo*, and our scope of review is plenary." **Commonwealth v. Mikitiuk**, 213 A.3d 290, 300 (Pa.Super. 2019). When reviewing a sufficiency challenge, we "must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable

to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt." **Commonwealth v. Feliciano**, 67 A.3d 19, 23 (Pa.Super. 2013) (*en banc*) (citation omitted). "Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail." **Id.** (citation omitted).

Reed argues the Commonwealth failed to prove he possessed and delivered the mega millions bag or any xylazine and fentanyl to the victim prior to his death. He argues the "only mention of 'mega millions' in [Reed's] phone was a single text from him to a person named Frank twelve days prior to decedent passing," where the text "merely acknowledges its presence on the market and its potency." Reed's Br. at 30. He points out that the text messages between him and decedent do not mention mega millions and the bag stamped mega millions did not contain his DNA profile. Reed also claims there was no heroin or fentanyl in his cross-body satchel or in the safe at the house searched, there was no packaging in the safe consistent with Detective Hyland's description of heroin's packaging, and the three controlled buys did not involve heroin or fentanyl.

Reed emphasizes that Detective Hyland testified that the texts showed that decedent had a routine of buying one or two bags a day from Reed, and that Reed and decedent met on June 14, 2023, but there was no communication between the two after that meeting. Reed notes that he texted decedent twice on June 16, 2023, and called him that same day, but decedent

- 12 -

did not respond. He argues that "[t]he fact that [Reed] and decedent routinely texted each other throughout the day on a daily basis to set up daily purchases and had not done so since June 14, 2023 is inconsistent with the conclusion that [Reed] must have delivered the fentanyl that was the cause of death on June 17, 2023." *Id.* at 31. He notes that the decedent's girlfriend testified and informed the police that she believed decedent had been deleting text messages and the police were not able to recover anything of evidentiary value from decedent's phone. He therefore argues the Commonwealth failed to establish possession.

A person commits the crime of drug delivery resulting in death when (1) the person "intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance"; (2) such act violates 35 P.S. §§ 780-113(a)(14) or (a)(30); and (3) "another person dies as a result of using the substance." *See* 18 Pa.C.S.A. § 2506(a); *see also Commonwealth v. Peck*, 242 A.3d 1274, 1281 (Pa. 2020). Section 780-113(a)(30), commonly known as PWID, prohibits a person not registered under the Controlled Substance, Drug, Device and Cosmetic Act from engaging in "manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance." 35 P.S. § 780-113(a)(30).

The trial court concluded that the evidence supported the convictions. It pointed to the sale of controlled substances from the hospital and noted that Reed carried the same satchel during that encounter as contained the controlled substances when he was arrested:

> [T]he final sale to [the decedent] that cost him his life occurred at Phoenixville Hospital. . . . Surveillance video showed [Reed] leaving through the hospital's main entrance and getting into [the decedent's] vehicle. [Reed] had a satchel-type bag with him. This was the same bag in which drugs were located at the time of his arrest. After the vehicle circled the building, defendant got out and went back into the hospital. Based on the record as outlined above, it is clear that the Commonwealth presented ample testimony and evidence from which the jury could find that every element of the crimes for which he was convicted were established beyond a reasonable doubt.

Trial Ct. Order at 1 n.1. We agree. The Commonwealth presented sufficient evidence that Reed delivered the controlled substances that resulted in decedent's death. Reed and the decedent communicated regarding the delivery of narcotics prior to his death, and video shows Reed and the decedent meeting on June 14. Further, Reed communicated with another person that "mega millions" was back.

Reed further argues the Commonwealth failed to establish that he possessed methamphetamine. He argues it failed to establish he had constructive possession of the drugs found in the safe. He notes that the forensic testing of the bags recovered from the safe established that many people handled the bags and that there was an incomplete source profile for the bags that did not match Reed. He further notes he told Pittman that certain things in the safe were in "Bev's" lane and should be given to her. He maintains that "[t]he convictions on possession of methamphetamine and [PWID of] methamphetamine rest solely on [Reed's] awareness of items within the safe, but to establish possession the Commonwealth needed to

- 14 -

show [Reed] had power and intent to control the methamphetamines." ***Id.*** at 37. He maintains the evidence showed that Reed acknowledged the methamphetamines belonged to Bev and should be returned to her.

To sustain a conviction for PWID, the Commonwealth must prove both the possession of a controlled substance and the intent to deliver it. ***Commonwealth v. Lee***, 956 A.2d 1024, 1028 (Pa.Super. 2008) (citations omitted). "In narcotics possession cases, the Commonwealth may meet its burden by showing actual, constructive, or joint constructive possession of the contraband." ***Commonwealth v. Vargas***, 108 A.3d 858, 868 (Pa.Super. 2014) (*en banc*) (citation omitted). "[C]onstructive possession is a legal fiction used to prove [possession] although the individual was not in physical possession of the prohibited item." ***Commonwealth v. Peters***, 218 A.3d 1206, 1209 (Pa. 2019). It exists where the defendant has "the power to control the contraband and the intent to exercise that control." ***Commonwealth v. Hopkins***, 67 A.3d 817, 820 (Pa.Super. 2013) (citation omitted). The Commonwealth may prove constructive possession by the totality of the circumstances. ***Hopkins***, 67 A.3d at 820. "[K]nowledge of the existence and location of the contraband is a necessary prerequisite to proving the defendant's intent to control, and, thus, his constructive possession." ***Commonwealth v. Parrish***, 191 A.3d 31, 37 (Pa.Super. 2018). Further, "[t]wo actors may have joint control and equal access and thus both may constructively possess the contraband." ***Commonwealth v. Jones***, 874 A.2d 108, 121 (Pa.Super. 2005) (citation omitted).

Here, the evidence supported a finding that Reed possessed the methamphetamine. The methamphetamine was in a safe in a house that Reed had been observed entering and exiting both before and after drug sales, and during the phone call he admitted knowing the contents of the safe. Moreover, he directed Pittman to relocate the substances, including the methamphetamine. The fact that Reed told Pittman in a phone call that some of the drugs in the safe were in Bev's "lane," that there was a mixture of DNA on the safe, and that his DNA was not on the bags removed from the safe did not prevent a finding beyond a reasonable doubt that Reed constructively possessed the controlled substance. The evidence was sufficient to prove that Reed had the power and intent to exercise control over all substances in the safe and that he therefore possessed them. *See Commonwealth v. McClennan*, 178 A.3d 874,879-80 (Pa.Super. 2018).

Reed next argues that the verdicts related to his possession of the cocaine he delivered to the confidential informant were against the weight of the evidence. Reed points out that Detective Hyland did not see the hand-to-hand exchanges and that Detective Kinsman testified he was about a block away from where the transaction occurred and could not identify the objects or quantity exchanged. He highlights Detective Rosado's testimony that he was using binoculars when observing the first June 20, 2023 transaction, his view was blocked for about 30 seconds, he started moving because he did not want to remain at a stop sign for too long, and saw the transaction as he started moving south. Reed's Br. at 41. Reed notes the Commonwealth did

- 16 -

not introduce the communications setting up the purchases or recordings of the transactions, did not conduct a DNA test on the drugs from the controlled buys, and did not call the confidential informant to testify.

We review a trial court's denial or grant of a weight claim for an abuse of discretion. *See Commonwealth v. Martin*, 323 A.3d 807, 823 (Pa.Super. 2024). When a trial court reviews a challenge to the weight of the evidence, it must determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000)). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Id.* (quoting *Widmer*, 744 A.2d at 752). The trier of fact is free to believe all, part, or none of the evidence and determine the credibility of witnesses. *See Commonwealth v. James*, 268 A.3d 461, 468 (Pa.Super. 2021).

Here, the trial court concluded the verdict was not against the weight of the evidence:

> In the instant case, the jury chose to find the Commonwealth's witnesses credible and decided not to believe [Reed's] version of events. Based on a review of the evidence, the jury's finding does not "shock one's sense of justice." Again, even though [Reed] tried to claim that he was innocent of the crimes charged, the Commonwealth presented sufficient evidence for the jury to conclude that he did, in fact, commit the crimes for which he was found guilty. Based on the evidence introduced at trial, the court

> finds that [Reed's] claim that the jury's verdict was against the weight of the evidence is without merit.

Trial Ct. Order at 2 n.1. The court did not abuse its discretion. The Commonwealth presented evidence that Reed sold cocaine. We cannot say that the trial court committed an abuse of discretion in concluding that the evidence Reed points to is not "clearly of greater weight that to ignore [it] or to give [it] equal weight with all the facts is to deny justice." *See Martin*, 323 A.3d at 823. This claim fails.

In the remaining issues, Reed challenges the discretionary aspects of his sentence. He first argues that the court abused its discretion in imposing a total aggregate sentence of 20 to 40 years' incarceration. He cites an academic article[5] that he states concluded that "for each year lived behind bars, a person can expect to lose two years off of their life expectancy." Reed's Br. at 43. He points out that he was 40 years old when the court imposed the sentence and, if paroled at his minimum term, he would be 59 years old when released. He alleges that the life expectancy for a non-incarcerated Hispanic male in the United States is 75 years and if a non-Hispanic white male reaches the age of 35, his life expectancy is 77. He argues, however, that the life expectancies "do not take into account [the] study regarding the effect of incarceration on life expectancy." *Id.* at 44. He further notes that parole is not guaranteed, so he could be incarcerated until he is almost 78 years old. He maintains that the "sentence has subjected him to a term 'unlikely to end

---

[5] Evelyn Patterson, *The Dose-Response of Time-Served in Prison on Mortality: New York State, 1989-2003*, American Journal of Public Health (2013).

during [his] natural life span or perpetually subject [him] to the discretion of the Board of Probation and Parole,' [which was] disapproved of in ***Commonwealth v. Coulverson***, 34 A.3d 135 (Pa.Super. 2011)." ***Id.*** He concludes that, "[c]onsidering [his] age, the sentence realistically subjects Appellant to Pennsylvania Parole Board supervision for the remainder of his life which is clearly unreasonable and manifestly excessive." ***Id.*** at 45.

Second, Reed maintains the court did not consider his rehabilitative needs, even though Reed's counsel mentioned Reed had a history of mental health concerns and drug and alcohol abuse.

Before reviewing the merits of a challenge to the discretionary aspects of sentence, this Court must first determine whether: "(1) the appeal is timely; (2) the appellant has preserved his issue; (3) his brief includes a concise statement of the reasons relied upon for allowance of an appeal with respect to the discretionary aspects of his sentence; and (4) the concise statement raises a substantial question whether the sentence is inappropriate under the Sentencing Code." ***Commonwealth v. Green***, 204 A.3d 469, 488 (Pa.Super. 2019).

Reed filed a timely appeal and included the issues in his post-sentence motion.[6] His concise statement of reasons for allowance of appeal does not

_____

[6] The Commonwealth maintains Reed failed to include his issue based on ***Coulverson*** in his post-sentence motion. However, we find he preserved this issue because in the motion he argued that the court failed to consider his age, and that "[i]n all likelihood, this could very easily be a life sentence for" Reed. Motion for Post-Sentence Relief, filed May 21, 2024, at ¶ 7.

- 19 -

cite any law supporting his assertion that his first claim— that "the sentence is unlikely to end during [his] natural life span"—on its own raises a substantial question.

To the extent Reed's Rule 2119(f) statement raises this claim, and insofar as his statement of questions involved suggests *Coulverson* supports a finding a substantial question here, we disagree. There, this Court found the appellant raised substantial questions that the trial court failed to offer specific reasons for the sentence that comported with Section 9721(b)'s considerations and imposed an excessive sentence without considering his rehabilitative needs, and the sentence was disproportionate to the circumstances. *Coulverson*, 34 A.3d at 143 (stating "to the extent that Coulverson's claim impugns the trial court's failure to offer specific reasons for the sentence that comport with the considerations required in section 9721(b) . . . we conclude that it raises a substantial question of the court's justification in extending Coulverson's standard range sentences to the statutory maximum"). We then concluded on the merits that the maximum sentence of 90 years was clearly unreasonable because the court considered only the impact of the crime on the victim and "evinced no consideration whatsoever of the dysfunction that marked Coulverson's own life, his cooperation and remorse, his attempts at reclaiming a productive role in society, or the possibility that, with appropriate mental health treatment, he might succeed at rehabilitation . . . ." *Id.* at 150.

Here, in contrast, Reed makes no claim that the court failed to consider factors or relied on only one factor when imposing the sentence. He merely argues that the sentence—20 to 40 years' incarceration—is excessive because he may be imprisoned for the remainer of his natural life. *Coulverson* does not support our review of such a question. Reed's first sentencing claim does not raise a substantial question.

In his concise statement for reasons relied on for appeal, Reed cites law that his second claim—the court failed to consider his rehabilitative needs when it imposed an excessive sentence—raises a substantial question. Reed's Br. at 24 (citing Sections 9781(c)(3) and 9721 and stating the court imposed an excessive sentence and failed to consider his mental health and rehabilitative needs). We agree and will review the claim's merits. *See Commonwealth v. Caldwell*, 117 A.3d 763, 770 (Pa.Super. 2015) (*en banc*) (finding a substantial question was presented where appellant challenged "the imposition of [a] consecutive sentence[] as unduly excessive, together with [a] claim that the court failed to consider his rehabilitative needs . . . .").

Sentencing is within the discretion of the trial court and will not be disturbed absent an abuse of discretion. *Commonwealth v. Rominger*, 199 A.3d 964, 970 (Pa.Super. 2018). "An abuse of discretion occurs where the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id.* (internal quotation marks and citation omitted).

- 21 -

When the court fashions its sentence, it must consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). Additionally, where the court had the benefit of a Pre-Sentence Investigation ("PSI") report, as the trial court did here, we may "assume the sentencing court was aware of the relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Griffin*, 65 A.3d 932, 937 (Pa.Super. 2013) (citation and internal quotation marks omitted).

The trial court concluded:

> In the instant case, [Reed] was correctly sentenced in accordance with 42 Pa.C.S.A. § 9721 and existing case law. The court took into account all relevant factors, including all the information provided in the presentence report and considered the protection of the public, the gravity of the offense, and the rehabilitative needs of defendant. The court notes that [Reed] has an extensive criminal history dating back to 2000. His prior offenses consist of a juvenile adjudication for Accidents Involving Death or Personal Injury, a juvenile adjudication for Receiving Stolen Property, four (4) prior PWID convictions, one (1) Possession of Controlled Substance conviction, one (1) Flight to Avoid Apprehension conviction, and three (3) Driving Under the Influence of Alcohol or Controlled Substance convictions. Despite all of his previous convictions and all of the time he spent in jail, [Reed] continued to sell drugs. He, in essence, continuously played Russian roulette with his customers' lives by selling them dangerous drugs, including crack cocaine, methamphetamine, and heroin/fentanyl. After considering [Reed's] prior criminal record, the seriousness of the crimes for which he was convicted, and all other factors, the court determined that an aggregate sentence of

> 20-40 years' incarceration was warranted. Accordingly, [Reed's] sentence is proper and should be upheld.

Trial Ct. Order at 5 n.1.

The court did not abuse its discretion. It reviewed all relevant factors, including Reed's rehabilitative needs, and did not impose an excessive sentence. This claim fails.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/11/2026